# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America | Case No.: MJ-24-04240-001-PCT-CDB |
|---|---|
| v. | CRIMINAL COMPLAINT |
| Matthew Edward Dach, | **SEALED** |
| Defendant. | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

## COUNT 1

On or about June 20, 2024, in the County of Mohave in the District of Arizona, Defendant MATTHEW EDWARD DACH did knowingly and intentionally distribute a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNT 2

On or about June 20, 2024, in the County of Mohave in the District of Arizona, Defendant MATTHEW EDWARD DACH did knowingly carry and use a firearm, that is a destructive device, during and in relation to a drug trafficking crime, and did knowingly possess a firearm, that is a destructive device, in furtherance of a drug trafficking for which he may be prosecuted in a Court of the United States, that is, distribution of methamphetamine, as alleged in Count 1 of the Complaint.

In violation of Title 18, United States Code, Section 924(c)(1)(B)(ii).

## COUNT 3

On or about June 20, 2024, in the County of Mohave in the District of Arizona, Defendant MATTHEW EDWARD DACH did knowingly possess a firearm, that is a destructive device, not registered to Defendant MATTHEW EDWARD DACH in the National Firearms Registration and Transfer Record.

In violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

**CC:  USM & PTS**

## COUNT 4

On or about June 28, 2024, in the County of Mohave in the District of Arizona, Defendant MATTHEW EDWARD DACH did knowingly possess a firearm, that is a destructive device, not registered to Defendant MATTHEW EDWARD DACH in the National Firearms Registration and Transfer Record.

In violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

I further state that I am a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives, and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated by Reference Herein.**

Continued on the attached sheet and made a part hereof: ☒ Yes   ☐ No

AUTHORIZED BY: Maria R. Gutierrez, AUSA

*Digitally signed by MARIA GUTIERREZ*
*Date: 2024.07.09 11:52:32 -07'00'*

ATF SA, Miriam Syers
Name of Complainant

MIRIAM SYERS
*Digitally signed by MIRIAM SYERS*
*Date: 2024.07.09 11:55:14 -07'00'*

Signature of Complainant

Sworn to before me and subscribed telephonically

July 9, 2024 at 5:14 PM     at     Flagstaff, Arizona
Date                                 City and State

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# STATEMENT OF PROBABLE CAUSE

I, Miriam Syers, Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Flagstaff, Arizona, being duly sworn, hereby depose and state as follows, to wit:

## INTRODUCTION AND AGENT BACKGROUND

1. Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since May 2023. I am presently assigned to the ATF Flagstaff Field Office. As a Special Agent of the ATF, my duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of federal and state laws. I have received training in the enforcement of the federal firearms and explosive laws. I have investigated individuals for federal firearms violations, which included National Firearms Act (NFA) and Gun Control Act (GCA) firearms crimes. I have also investigated individuals for federal drug violations.

2. I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the ATF National Academy Special Agent Basic Training (SABT). This training was approximately twenty-seven weeks in duration and included training in firearms and ammunition identification, firearms trafficking, report writing, interviewing, alcohol/tobacco diversion investigations, explosives and arson investigations, firearms and tactical training, close quarter countermeasures, field operations, undercover techniques, federal criminal statutes, constitutional law, and federal court procedures.

3. Prior to my employment as a Special Agent, I was a sworn police officer with Northern Arizona University Police Department (NAUPD) for approximately five years and attended Phoenix Regional Police Academy. While employed at NAUPD, I was assigned as a Task Force Officer (TFO) to the Northern Arizona Metro Narcotics Task Force and investigated numerous federal, state, and local violent street crimes and drug trafficking cases as well as other crimes. I have experience writing and executing search warrants, managing confidential informants, interviewing witnesses, and conducting undercover operations. I also have specific training in social media investigations. Because of my training and experience, I am empowered to investigate violations of federal law.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts below, I believe there is probably cause to believe that MATTHEW EDWARD DACH ("DACH") committed violations of 18 U.S.C. § 924(c)(1)(B)(ii), Possess/Use of a Firearm in Furtherance of, and In Relation to, a Drug

Trafficking Crime; 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), Distribution of Methamphetamine; and 26 U.S.C. § 5861(d), Possession of an Unregistered Firearm[1,2].

## PROBABLE CAUSE

### May 29, 2024:  First Controlled Purchase

6. On May 29, 2024, an ATF Special Agent acting in an undercover capacity (UC) and another individual traveled to a camper trailer in Kingman, Arizona.[3] The UC observed an individual he recognized as DACH from his Mohave County booking photograph. DACH was sitting outside the front door of the small camper trailer, and he was holding an air compressor hose. DACH invited the UC into his trailer and showed the UC he was making a rocket constructed from a PVC pipe, with a .22 caliber round of

---

[1] 26 U.S.C. § 5845(a) defines "destructive device" as: 1) any explosive, incendiary, or poison gas, bomb, grenade, rocket having a propellent charge of more than four ounces, missile having an explosive or incendiary charge of more than one-quarter ounce, mine, or similar device; 2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and 3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of Title 10, United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

[2] The elements for 26 U.S.C. § 5861(d) are: 1) the accused knowingly possessed a firearm; 2) the accused was aware that the firearm was a destructive device; and 3) the accused had not registered the explosive within the National Firearms Registration and Transfer Record.  The term "firearm" is defined by 26 U.S.C. § 5845(a).

[3] All meetings and conversations between DACH were audio and video recorded and saved.

ammunition attached to the tip and an ignition switch connected to an air compressor. DACH explained when the tip of the rocket hit the ground, it would explode. DACH also showed the UC several devices that appeared to be missiles made from PVC with air stabilizers attached to the end. One of the devices had a fuse attached to the top but the devices all appeared to be hollow. DACH stated that he was trying to decide how much powder he would need to add to the device. DACH explained that the device would be a "M-1000," which refers to the size of the device. DACH then showed the ignition switch that would propel the device using compressed air. DACH showed the UC how the PVC pipe missile fit into the compressed air launcher and would shoot up and explode after the fuse was lit. DACH advised the UC he had been building explosive devices and showed the UC a small cylindrical device wrapped in blue paper that was approximately 11cm long and 1.5cm wide, with approximately 2.5cm of red hobby fuse protruding from near the center of the cylinder, that had "TNT" and what appeared to be SS lightning bolts written on the side of the device (later determined to contain approximately 15.3 grams of fine grey powder) and a smaller cylindrical device approximately five cm long and two cm wide wrapped in duct tape with green hobby fuse attached weighing approximately 12.3 grams. DACH explained he mixed his own explosive powder for these devices and showed the UC a white jar of explosive and stated, "I mix my own powder, flash powder." The UC observed a bag on the floor of the trailer next to DACH that said in black bold letters "potassium nitrate." Based on my training and experience, I know that potassium nitrate is an ingredient used for manufacturing explosives.

7. The UC asked DACH about methamphetamine for sale, and DACH stated Kingman had been "dry," but he would have the methamphetamine later. The UC observed 7.62 ammunition in various locations within the trailer and asked DACH about firearms. DACH showed the UC a rifle and advised it was not his firearm. The UC requested to purchase the firearm. DACH stated that he would have to ask. The UC observed DACH leave the trailer and walk over to a nearby single wide trailer. DACH returned a short while later and advised the UC he could sell the firearm. After further conversation, the UC purchased a Tapco, Model: TAP-15, Caliber: 7.62, Rifle *(Figure 1)*, 53 rounds of Tula 7.62 ammunition, firearms accessories, and two explosive devices *(Figure 2)* from DACH. Later, an ATF Bomb Technician used a butane torch on a small amount of powder from within the device marked with "TNT" which deflagrated rapidly with a bright flash. Based on my training and experience, explosives are any chemical compound, mixture, or device, the primary or common purpose of which is to function by explosion. The bright flash, as opposed to burning, indicates that the powder within the device is an explosive.



*Figure 1*



*Figure 2*

**June 20, 2024: Second Controlled Purchase**

8. On June 20, 2024, the UC spoke with DACH over the telephone. The UC later met with DACH at his camper trailer. Inside the trailer, the UC observed a glass pipe used to smoke methamphetamine in the residence. The UC also observed ammunition and other items such as fuses, switches, what appeared to be PVC pipe parts, glue, a stand to hold the small explosive devices while DACH fills them with flash powder, a bag of potassium nitrate, and the same white jar of homemade flash powder, which based on my training and experience, may be used to manufacture explosive devices. The items were located throughout the trailer. DACH provided the UC a plastic bag containing approximately 18 red explosive devices with green hobby fuses attached and later stated "everybody wants these." DACH also provided the UC a small metal device that had a 12-guage shotgun shell affixed to the inside and a metal smooth bore attachment (a suspected destructive device). DACH explained that one side of the suspected destructive device had

a tripwire, and the other end has a metal attachment that directed the shotgun blast in a specific direction. The UC asked about the incomplete PVC devices he observed on May 29, 2024, and DACH stated that an individual ("Individual 1") stole all those devices the night before. DACH also advised that Individual 1 has a restraining order against DACH. DACH showed the UC several other partially finished explosive devices, which he described as "goodies" that he had been building.

9. As part of the ruse, the UC told DACH that an individual was going to testify against the UC's brother in federal court in California, and that he "would like to make a statement," meaning that the UC wanted to encourage the witness not to testify by blowing up his vehicle. The UC asked DACH if the devices he made were large enough to damage a vehicle. DACH told the UC that he would make a large explosive device with shrapnel that would rip through a vehicle and stated something with "310 grams" of explosive powder would "knock the doors off." DACH told the UC to place the device under the steering wheel so when the driver started the vehicle, the device would go off and "get him too." DACH said that he was just about to make an explosive device that contained "310 grams" of explosive powder like the device they were discussing before the UC came to his house the first time, because he "was pissed." DACH did not say what he was angry about. While discussing the plan with the UC, DACH was animated, smiling, laughing, and rubbing his hands together excitedly, and appeared to be excited to make an explosive device that was designed to "really hurt somebody."

10. DACH also told the UC that he believed that Individual 1 is responsible for DACH going to prison on two occasions. DACH said that he believes that he would only

be sentenced to nine years in prison if he were to murder Individual 1 and added that nine years is "starting to sound like a vacation." The UC told DACH that he would be willing to help him deal with Individual 1. DACH agreed and stated, "if I handle this for you and you handle this for me."

11. At the conclusion of the meeting, the UC purchased from DACH a total of approximately 20 small homemade explosive devices with hobby fuses attached, a small bag of white crystalline substance that field tested positive for methamphetamine and weighed 1.1 grams, and the device with tripwire and attachment (the suspected destructive device) *(Figure 4)*. One of the small homemade explosive devices appeared to have a fin that was made on a 3D printer, base, and nose with hobby fuse attached to the top.

12. The ATF Firearms Technology Criminal Branch conducted a technical examination of the suspected destructive device, and determined it was a "firearm" under the GCA and NFA, and a "Destructive Device" under the GCA and NFA (described as an explosive antipersonnel mine). The device did not have a serial number.



*Figure 4*

**June 28, 2024: Third Controlled Purchase**

13.     On June 28, 2024, the UC met with DACH at his camper trailer. DACH invited the UC into the trailer. The UC observed a pipe used to smoke methamphetamine on the floor, as well as a piece of glass with DACH's driver license and white powdery substance on the table. The UC also observed some of the same items described above, which, based on my training and experience, are used to manufacture explosive devices. The items were in various locations throughout the trailer.

14.     DACH showed the UC a metal Maglite flashlight that had been hollowed out and a small hole had been predrilled at the top of the flashlight for a fuse. DACH unscrewed the top and poured out the contents including screws, bolts, and other small metal objects that he had preplaced inside. DACH previously texted the UC stating he was thinking about equipping the device with a "lightning" mechanism or remote ignition. During this meeting, DACH again discussed equipping the device with different types of switches, but the UC stated it did not need to be overly complicated. DACH then left camper trailer and walked over to the nearby single wide trailer and entered the front door which appeared to be unlocked. He did not knock to enter the residence. DACH returned from the single wide trailer with a long piece of green commercially made explosive fuse. It appeared to be the same type of fuse that DACH used for the explosive devices that he previously sold to the UC. As DACH proceeded to complete the device, the UC asked DACH to explain the whole process, so he "doesn't blow himself up." DACH explained he was first going to install the fuse, and it was long enough so the UC would have plenty of time to get out of the way prior to the explosion. DACH then lit a torch and melted a glue stick to secure

the fuse in place. The UC nervously expressed how dangerous it was for DACH to be dripping melted glue that was still on fire, on top of explosive flash powder. The UC observed that it appeared like DACH had experience going through this process. DACH said that it was dangerous, but he had the skill to complete the task. DACH explained that the device "would go like a pipe bomb," including what he described as "ball bearings" to create "shrapnel" to increase the lethality. The UC observed DACH place explosive powder, screws, nails, and other small metal objects into the device. The UC asked what is going to happen when the device goes off and DACH stated, "It's going to be a big explosion" and added that there was approximately "310 grams" of explosive powder inside the device. DACH compared the device to a hand grenade and explained that the outside of the device becomes shrapnel. DACH stated that if the explosive device was on or near the intended victim, it was going to kill him or seriously injure him. The UC stated that he planned to throw the device in the intended victim's vehicle. DACH coached the UC by explaining that he would need to shorten the fuse so that the time will be much shorter. DACH recommended that the UC throw the device in the intended victim's lap. DACH demonstrated that if the device was thrown on the intended victim's lap within a vehicle, the fuse would only allow the victim time to brush the device forward, and the victim would still be in the "kill zone." DACH went on to state, "Even if he swats it to the side, the shrapnel is still going to get him" and that if the shrapnel doesn't get him, the percussion from the explosion will. DACH explained that when he sets off a M-1000, he can see the percussion waves from the explosion. This explosion will be much bigger. The UC asked DACH if he believed that the device was going to kill the intended victim and

DACH stated "oh yeah," and confirmed that the victim will not be testifying. DACH added that "it's going to tear it apart."

15. The UC and DACH also spoke of DACH's request that the UC kill Individual 1. DACH said he did not want to use an explosive device. DACH said that it would be better if Individual 1 just disappeared.

16. The UC purchased the "pipe bomb" (*Figure 5 and Figure 6)* from DACH.




*Figure 5*  *Figure 6*

17. ATF SA/Bomb Technician Chris Livingston conducted a technical examination of the "pipe bomb" purchased on June 28, 2024, and determined it contained approximately 160 grams of fine dark colored powder and approximately 21 pieces of fragmentation that appeared to be nails, screws, and other items of hardware. The body of the Mag-Lite, the base, a sample of the green pyrotechnic fuse, and the 21 items of fragmentation will be sent to the ATF laboratory for explosive testing. The device was also examined by the ATF Destructive Device Determination Unit who advised the device is consistent with the construction and characteristics of a Destructive Device and would be

properly identified as an explosive bomb as that term is defined in 26 U.S.C., Chapter 52, Section 5845(f). The official determination will be verified with lab analysis once the lab receives the items.

18. A records search of the National Firearms Registration and Transfer Record (NFRTR) revealed no evidence that any of the devices described above are registered to, or have been acquired by lawful manufacture, importation, or making by, or transfer to DACH.

## CONCLUSION

19. Based on the information set forth in this affidavit, I believe that there is probable cause to believe that DACH committed the offenses as charged in the Complaint.

20. I declare under penalty of perjury under the laws of the Unites States of America that the forgoing is true and correct.

MIRIAM SYERS  
Digitally signed by MIRIAM SYERS  
Date: 2024.07.09 11:27:43 -07'00'

MIRIAM SYERS  
Special Agent  
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn telephonically on July __9__, 2024.

HONORABLE CAMILLE D. BIBLES  
United States Magistrate Judge